**SIGNED this 10th day of April, 2009.**

_____
**LEIF M. CLARK**
**UNITED STATES BANKRUPTCY JUDGE**
_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| HARDWOOD P-G, INC., | ) | Case No. 06-50057-LMC |
| CUSTOM FOREST PRODUCTS LTD., | ) | Chapter 11 |
| AND CUSTOM FOREST PRODUCTS | ) | |
| TRANSPORTATION, INC., | ) | |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

| | | |
|---|---|---|
| | ) | |
| RANDOLPH N. OSHEROW, | ) | |
| LITIGATION TRUSTEE, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Adversary No. 08-05006 |
| | ) | |
| DONALD R. VANN, ROBERT EARL | ) | |
| ADAMS, BILL J. TIDWELL, | ) | |
| ANTHONY B. SMITH, B.J. TIDWELL | ) | |
| INDUSTRIES, INC., SIGNATURE | ) | |
| MOULDINGS & MILLWORKS, INC., | ) | |
| SIGNATURE PARTNERS, LTD., | ) | |
| TIDWELL/VANN, L.P., WELLTID, | ) | |
| LLC, and WELLVANN, LLC, | ) | |
| | ) | |
| Defendants | ) | |

1

**MEMORANDUM OPINION REGARDING RANDOLPH N. OSHEROW'S MOTION FOR *IN CAMERA* INSPECTION OF REPORTS AND MOTION FOR PROTECTIVE ORDER WITH RESPECT TO CERTAIN DISCOVERY PROPOUNDED BY SIGNATURE MOULDINGS & MILLWORK, INC., AND SIGNATURE PARTNERS, LTD.**

Before the court on October 14, 2008 were three motions, two motions (incorporated in a single pleading) by Randolph N. Osherow, the above-captioned litigation trustee, and one by defendant Robert Earl Adams ("Adams"). The court ruled on the record on Adams' motion, and has since entered an order. This opinion addresses the trustee's motions. The following factual background is a matter of record.

The debtors filed voluntary petitions under chapter 11 of the bankruptcy code on or around January 9, 2006, and were jointly administered by an order entered January 20, 2006 [Docket No. 33].[1]  The Debtors employed Langley & Banack, Inc. ("L&B") as debtors' counsel [Docket Nos. 35, 56].  On January 24, 2006, the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Committee") pursuant to 11 U.S.C. § 1102. *Disclosure Statement*, at 20 (hereinafter "Discl. Stmnt") [Docket No. 326]. The Committee retained the law firm of Haynes and Boone, LLP ("H&B") on March 14, 2006 [Docket No. 163]. The debtors employed Alvarez & Marsal, LLC ("A&M") as the debtors' forensic accountants, a retention approved by the court on May 10, 2006 [Docket Nos. 160, 217].

A&M was retained to (among other things) investigate the Debtors' potential causes of action for preferential and fraudulent transfers. *Discl. Stmnt.*, at 17-18. A&M prepared a report (the "A&M Report") for the debtors discussing its specific findings as to the debtors' possible claims. *Id.* Additionally, H&B prepared a report (the "H&B Report") for the Committee

---

[1] The docket numbers referred to in this section of the order are located in the main case at 06-50057.

investigating a number of matters – including the debtors' possible preference and fraudulent conveyance causes of action. *H&B Report*, at 1. The H&B Report was an ongoing venture that was updated as new facts came to light. CITE. (*Hughes Decl.*, at ).

At some point prior to the debtors' plan of reorganization being approved, the debtors, Webster Business Credit Corporation as agent bank for itself and Citizens Business Credit (the "Lenders"), and the Committee, agreed that it was appropriate to assert preference and avoidance claims. *Discl. Stmnt.*, at 14. On September 2, 2006, the court approved the retention of H&B and L&B as special counsel to the debtors to represent the debtors on a contingency basis with respect to certain potential preference claims. *Discl. Stmnt*, at 14. On September 5, 2006, the court entered an order [Docket No. 280] authorizing the Committee, with the consent of the debtors and the Lenders, to bring certain estate claims on behalf of the debtors for the recovery of preferences and fraudulent conveyances.[2]

Ultimately, the debtors' Plan was confirmed on December 8, 2006 [Docket No. 393]. The Plan was a joint effort by the debtors, the Committee, and the Lenders. *Discl. Stmnt.*, at 16. The Plan provided for the formation of a litigation trust (the "Litigation Trust"),[3] over which the litigation trust's trustee (the "Trustee") would preside. *Plan*, at 15. The Plan states that

> [i]n addition to the Litigation Trust being the assignee of the Avoidance Actions and Litigation Claims, the Litigation Trust shall be deemed to be a successor-in-interest to the Committee and shall have standing on behalf of the holders of Class 3 Claims to enforce the rights granted them under this Plan…
>
> The Litigation Trust will be administered by the Trustee. All major decisions including, but not limited to, the retention of and the fee arrangements with Professionals and the commencement, continuation, settlement, trial or appeal

---

[2] The adversary proceeding at issue here was commenced on January 8, 2008; it was not one of the claims that the Committee filed on behalf of the debtors' estate.
[3] The Litigation Trust was formed pursuant to the terms of the Hardwood P-G Inc., Litigation Trust Agreement [Docket No. 370].

> of claims by or against third parties, will be decided by the Trustee and the
> representative of Webster and the designee of the Committee (or their
> successors as provided above).

*Id.* Pursuant to the Plan, the Trustee was to hire both L&B and H&B as special counsel to

continue to litigate the various causes of action that had already began but that had been

assigned to the Litigation Trust under the Plan. *Id.* at 16-17. This adversary proceeding is one of

the assets that was transferred to the Litigation Trust, although, (as noted above) it was not

commenced until the post-confirmation period.

The H&B Report was not shared with any party (aside from the Committee members)

until after the Litigation Trust succeeded to the Committee's interests. *Hughes Decl.*, at 3[4]

(saying that while H&B "acted as Committee counsel, the Haynes and Boone Report was not

disseminated to anyone other than the members of the Creditors' Committee."). It appears

that it was only after the Committee ceased to exist on the effective date of the Plan, and the

Litigation Trust succeeded to the Committee's interests, that the Trustee gained possession of

the H&B Report. The A&M Report was shared amongst the debtors, the Committee, and the

Lenders. *Id.* (saying that it "was always contemplated that the Alvarez Report would be shared

jointly between the debtors, the Committee and the Banks [Webster Business Credit and

Citizens Business Credit], which was authorized and contemplated as part of the resolution of

issues arising in connection with final approval of... [the Debtors' DIP financing].") Following

final approval of the debtors' DIP financing, but before a Plan had been filed, the Committee,

the debtors and the Lenders "had conceptually agreed to promote a joint liquidating plan of

---

[4] The Hughes Declaration is attached to the Trustee's motion for protection as to the Reports as Exhibit A.

reorganization in the case." *Id.* A&M was retained to provide services so that a joint plan of liquidation – which ultimately became the Plan – could come to fruition. *Id.*

**1.  The Trustee's Motion for Protection and for In Camera Inspection of Haynes and Boone Report and Alvarez Report (the "Reports Motion")**

On September 30, 2008, the Trustee filed a motion titled "Motion for Protection and for *In Camera* Inspection of Haynes and Boone Report and Alvarez Report" (the "Reports Motion") [Docket No. 81]. On October 14, 2008, Signature filed a response to the Reports Motion [Docket No. 86] and on October 17, 2008, Adams also filed a response to the Reports Motion [Docket No. 88]. On October 28, 2008, the Trustee filed a reply in support of the Reports Motion [Docket No. 89]; and, finally, on November 3, 2008 and November 7, 2008, both Adams [Docket No. 90] and Signature [Docket No. 91], respectively, filed a sur-reply.

**a.  The Pleadings**

*The Plaintiff's Arguments*

In the Reports Motion, the Trustee asks the court to enter an order to the effect that the Reports are "confidential, privileged, and not discoverable in this case." *Reports Mot.*, at 2. The Trustee makes two arguments in support: first, that the Reports are protected by the attorney-client privilege either directly or by way of the common interest doctrine; and second, that the Reports constitute attorney work product. *Id.*   The Trustee claims to hold these privileges by virtue of the Plan's terms, which (1) assign all of the Debtors' assets – explicitly including the Debtors' preference and avoidance claims – to the Litigation Trust; and (2) cause the Litigation Trust to be the successor-in-interest to the Committee's preference and avoidance causes of action. *Id.* at 7-9. The Trustee also notes that to the extent the Reports

were shared with his current counsel – MehaffyWeber, P.C. – prior to that firm's official retention, MehaffyWeber had signed a confidentiality agreement. *Id.* at 8. (Indeed, the Trustee asserts that to the extent the Reports were shared with any other firms that the Trustee was interviewing as potential counsel in this matter, all were subject to a confidentiality agreement. *Id.*)

The Trustee points out that the H&B Report was prepared by H&B for its client, the Committee; and because under the Plan the Litigation Trust succeeded to all of the interests of the Committee, the Trustee now holds and may assert the Committee's attorney-client privilege. *Id.* at 9. The A&M Report was prepared for the debtors in order to investigate the estate's potential causes of action against third parties. *Id.* at 14. When, under the Plan, the debtors' assets vested in the Litigation Trust, the Trustee holds the debtors' attorney-client privilege as to the A&M Report. Alternatively, if he is not a successor-in-interest to the Committee or the debtors, the Trustee claims to still assert the attorney-client privilege as to both Reports because the debtors/Trustee, the Lenders and the Committee "have common legal interests: to pursue and liquidate the estate's legal causes of action in order to realize the value of those assets for the benefit of the creditors." *Id.* at 11.

The Trustee also argues that the Reports are protected by the work product doctrine. *Id.* at 12-13, 15-16. More specifically, as to the H&B Report, the Trustee notes that it "attaches only 16 documents out of the thousands of pages of relevant documents. Such a selection shows the mental impressions, strategy and opinions of Haynes & Boone." *Reports Mot.*, at 13. The Trustee contends that the Reports meet all of the elements required for them to be

considered protected work product, *Id.* at 13, 15, and are thus protected from discovery by the opposing parties.

The Trustee in his reply adds that he retained H&B after the Plan was confirmed and became effective. The Trustee further argues, in support of his work product privilege for the H&B Report that it was prepared in anticipation of litigation with respect to the debtors' financing, and "on later issues pertaining to projected confirmation of a consensual plan of reorganization supported by the Committee, the Debtors, and the secured lenders, which following confirmation would include the assertions of causes of action for the benefit of the bankruptcy estates and all creditors." *Id.* at 3. The Trustee cites to *In re Grand Jury Subpoenas, 89-3 and 89-4, John Doe 89-129*, 902 F.2d 244, 249 (4th Cir. 1990) as support of his assertion that the common interest doctrine is not limited to defendants and may also apply to plaintiffs. *Id.* at 2.

Lastly, the Trustee challenges Adams and Signature's contentions that there is a substantial need for the Reports. First, the Trustee notes that he will be able to prove the allegations in the complaint without utilizing the Reports. *Id.* at 3-4. Second, because the Reports constitute opinion work product, Adams and Signature need to show a <u>compelling</u> (as opposed to substantial) need for the Reports. *Id.* at 4. And, third, the H&B Report "constitutes an attorney-client communication. It… was drafted as legal advice from attorney to client." *Id.* The Trustee again notes that Adams and Signature's desire to avoid having to review the documentary evidence in this case does not constitute a compelling need that justifies setting aside the policies of protecting work product. *Id.*

*Signature and Adams' Arguments*

Both Signature and Adams object to the Trustee's position that the Reports are not

discoverable. Signature argues that the H&B Report is not subject to attorney-client privilege

for three reasons: first, it was prepared for the Committee, not the Trustee; consequently only

the Committee, as H&B's client, and not the Trustee may assert the privilege; second, the H&B

Report was not kept as a confidential communication since it was distributed to a number of

parties including the various Committee members and their respective counsel, the Trustee,

the Trustee's counsel in this adversary proceeding, other counsel who the Trustee considered

hiring to represent him in this adversary proceeding, and maybe other parties (citing *United*

*States v. El Paso Co.*, 682 F.2d 530, 539 (5th Cir. 1982); and third, citing to *Caplin v. Marine*

*Midland Grace Trust Co. of New York*, 406 U.S. 416, 428-29 (1972) and *In re Seven Seas*

*Petroleum*, 522 F.3d 575, 584 (5th Cir. 2008) Signature argues that the Trustee "has no right to

bring claims that belong solely to the estate's creditors…," *Signature Resp.*, at ¶ 5, and that

therefore the Trustee cannot be  a successor-in-interest to the Committee because "there is no

rule that allows the Trustee to step into the shoes of the Committee, and the [sic] therefore

there is no attorney-client privilege between the Haynes & Boone attorneys and the Trustee."

*Id.*, ¶¶ 3-5. Furthermore, Signature argues that the common interest doctrine does not apply

because the parties are co-plaintiffs, not co-defendants (Signature contends the common

interest doctrine applies only to co-defendants). Moreover, Signature says the H&B Report

cannot be work product because it was not prepared in anticipation of litigation. *Id.* at ¶¶ 6-7.

Signature notes that "the issues addressed [in the H&B Report] were not related to the issues

involved in this adversary proceeding…," *Id.* at ¶ 9, so it could not have been made in anticipation of litigation. *Id.* Finally, Signature says that the H&B Report should be produced anyway because, otherwise, Signature will be forced to comb through three hundred boxes of relevant documents, which constitutes an undue hardship. *Id.* at ¶ 10.

With regard to the A&M Report, Signature notes that the A&M Report was created by an accounting firm, not an attorney, so it cannot privileged. *Signature Resp.*, at ¶ 11. Signature adds that A&M was hired by the debtors, not by an attorney, so the accountants' work could not be privileged on that basis. *Id.* at ¶ 14. Signature says that the work A&M performed for the debtors was not necessary "for the client's consultation…," *Id.* at ¶ 16. *Id.* Additionally, Signature contends that "the Trustee has still not met his burden because he cannot prove that the Alvarez report remained a confidential communication between an attorney and a client...," *Id.* at ¶ 12, as the A&M Report was shared amongst the debtors, the Committee, H&B, the Lenders and other attorneys. *Id.* Signature goes on to argue that the A&M Report cannot meet the requirements of the common interest doctrine or the work product doctrine for the same reasons as the H&B Report. *Id.* at ¶¶ 18-19.

Adams joined in Signature's arguments.  Adams adds that because "neither the Trustee, nor the Trust Committee was the client when the Haynes and Boone Report was prepared, nor was the Haynes and Boone Report prepared on behalf of the Trustee or the Trust Committee…," *Adams Resp.* at 6, and because the H&B Report was distributed to these parties, as well as to their counsel, the attorney-client privilege was lost. *Id.* Because the H&B Report was not prepared for the debtors or the Litigation Trust in preparation for this litigation, Adams says it also cannot constitute work product. *Id.* at 7.

With respect to the A&M Report, Adams echoes the points made by Signature. *Id.* at 8-9. Adams says that it too would suffer an undue hardship if the Reports are not produced because the Trustee's complaint is based solely on the information in the Reports and such information, says Adams, cannot be discovered from any other source. *Id.* at 9-10. Lastly, Adams notes that if the Trustee intends to call A&M or H&B as experts at some point during the trial, the Reports will have to be disclosed eventually anyway. *Id.* at 10.  Both Signature and Adams filed sur-replies at the beginning of November 2008. They cite to *In re Yarn Processing Patent Validity Litigation v. Leesona Corp., et. al.*, 530 F.2d 83, 90 (5th Cir. 1976) and make (for the first time) a new argument with regard to the attorney-client privilege: "the mere assignment under the terms of a confirmed plan of 'Committee rights' does not entail an assignment of the attorney/client privilege between the Committee and its counsel." *Adams Sur-Reply*, at 4; *see also Signature Sur-Reply* ¶ 2.  Moreover, Adams adds that "the post-confirmation employment [of H&B] relates solely to their efforts as special counsel to prosecute select avoidance claims on a contingency fee basis and not to prepare and/or present reports to the Trustee… The post-confirmation employment of Haynes & Boone did not authorize Haynes & Boone a [sic] disclosure of confidential information belonging to the Committee – since that privilege belongs to the client – the Committee." *Adams Sur-Reply* at 3. Thus, when the H&B Report was provided to the Trustee, a third party, the attorney-client privilege was waived. *Id.* at 4. With regard to the Trustee's assertion of the common interest doctrine, Adams again raises a new argument: "the Common Interest Doctrine has no application because the Committee is a non-existent party with which the Trustee can not have a common interest." *Id.* at 5; *Signature Sur-Reply* at ¶ 3. Thus, there is "simply no practical application of the Common

Interest Doctrine." *Adams Sur-Reply*, at 5; *Signature Sur-Reply* ¶ 3 (neither party cites a case to support this proposition). For these reasons, both Signature and Adams asks that the Reports Motion be denied in full.

**b. Analysis**

*Attorney-Client Privilege*

We turn first to whether the Trustee is the holder of an attorney-client privilege. In *Commodity Futures Trading Commission v. Weintraub*, 471 U.S. 343, 85 L.Ed. 2d 372, 105 S. Ct. 1986 (1985), the Supreme Court noted that because a corporation can only act through its agents, a corporation itself can neither assert nor waive the attorney-client privilege. *Official Comm. of Unsecured Creditors of Hechinger Inv. Co. of Del. v. Fleet Retail Fin. Group, et. al. (In re Hechinger Inv. Co. of Del.)*, 285 B.R. 601, 610 (D. Del. 2002) (discussing *Weintraub*). Instead, corporate management undertakes actions by a solvent company; when control of the company is passed to new management, the authority to act on behalf of the corporation also passes to that new management. *Id.* "'[N]ew managers installed as a result of a takeover, merger, loss of confidence by shareholders, or simply normal succession, may waive the attorney-client privilege with respect to communications made by former officers and directors.'" *Am. Int'l Specialty Lines Ins. Co. v. NWI-I, Inc., et. al.*, 240 F.R.D. 401, 405 (N.D. Ill. 2007) (citing *Weintraub*, 471 U.S. at 349). However, when a company declares bankruptcy, all of the corporation's property transfers to an estate managed by a trustee (or by a debtor-in-possession, as the case may be). *Id.* The bankruptcy trustee effectively becomes the bankrupt's management and the power of the company's pre-bankruptcy managers is severely restricted. *Id.* at 610-611. For this reason, the Supreme Court held in *Weintraub* that "the trustee's role is 'most analogous to that of a solvent corporation's management,' and therefore, the right to

assert or waive the attorney-client privilege of the debtor corporation rests with the trustee in a bankruptcy situation." *Id.* at 611 (citing *Weintraub*, 471 U.S. at 349).

Apparently ignoring what the Supreme Court had to say in *Weintraub,* Signature and Adams rely on Fifth Circuit case that both pre-dates *Weintraub* and the enactment of the Bankruptcy Code. *See In re Yarn Processing Patent Validity Litig.*, 530 F.2d 83 (5th Cir. 1976). They cite this older case for the proposition that, when assets are transferred, the attorney-client privilege does not follow the transfer. Of course, the Supreme Court's ruling necessarily trumps, but the case Is inapposite anyway. The attorney-client privilege was not even an issue before the court. 530 F.2d, at 84.  The case concerned litigation over the *disqualification* of an attorney due to a *conflict of interest*, and did not even address the proposition for which it is here urged.  *See id.*; *see also Am. Int'l Specialty Lines Ins. Co. v. NWI-I, Inc., et. al.*, 240 F.R.D. 401, 408 (N.D. Ill. 2007) (saying that one party's citation to *In re I Successor Corp.*, 321 B.R. 640 (Bankr. S.D.N.Y. 2005), which disqualified a law firm from representing one of the parties before it, was distinguishable because it did "not discuss the general principle that the right to assert or waive a corporation's attorney-client privilege is an incident of control of the corporation.") It is true that *In re Yarn Processing* does discuss whether an attorney can be said to represent a successor entity that acquires an asset from the predecessor who was the attorney's client, and it may be from that observation that Signature and Adams intend to extrapolate the broad proposition they urge in their pleadings. However, no such broad rule can be gleaned from *Yarn Processing.* To the contrary, *Yarn Processing* says only that the attorney-client relationship does not follow the transfer of *an* asset (there, a patent). *Weintraub*, on the other hand, concludes that the transfer of *all* the assets of a corporation, such that nothing is left behind, may result in

12

a transfer of the privilege that inheres in the attorney-client relationship. A district court for the

Eastern District of Texas explained it thusly:

> 'whether the attorney-client relationship transfers . . . to the new owners turns on the practical consequences rather than the formalities of the particular transaction.' *Tekni-Plex, Inc. v. Meyer and Landis*, 89 N.Y.2d 123, 674 N.E.2d 663, 668, 651 N.Y.S.2d 954 (N.Y. 1996); *see also Ramada Franchise System, Inc. v. Hotel of Gainsville Associates, Inc.* 988 F. Supp. 1460, 1464 (N.D. Ga. 1997). If the practical consequences of the transaction result in the transfer of control of the business and the continuation of the business under new management, the authority to assert or waive the attorney-client privilege will follow as well. *See Community Futures Trading Commn. v. Weintraub*, 471 U.S. 343, 349, 85 L. Ed. 2d 372, 105 S. Ct. 1986 (1985) ('when control of a corporation passes to new management, the authority to assert and waive the corporation's attorney-client privilege passes as well.'); *see also Tekni-Plex, Inc.* 674 N.E.2d at 668; *Ramada Franchise System, Inc.*, 988 F. Supp. at 1463.

*Sovereign Software LLC v. Gap, Inc.*, 340 F.Supp.2d 760, 763 (E.D. Tex. 2004); *see also American International*, 240 F.R.D. at 406 (citing *Sovereign Software*). The facts of this case are much closer to *Weintraub* than to *Yarn Processing*. <u>All</u> of the Debtors' assets (including those causes of action that had been asserted on behalf of the debtor estate by the Committee) were transferred to the Litigation Trust under the sole management and control of the Trustee. Under *Weintraub* and *Sovereign Software,* the Trustee became the holder of the Debtors' attorney-client privilege.

Signature's argument that the Trustee cannot hold the Committee's attorney-client privilege because the Trustee lacks standing to pursue creditor's claims is incorrect and irrelevant to this discovery dispute.  Signature misunderstands the roles of statutory committees in bankruptcy cases with regard to the assertion of causes of action. Committees, in the discharge of their statutory duties in the administration of a bankruptcy case, are entitled to retain their own counsel. Any communication that takes place between the committee and

its counsel is then privileged. A committee might, as one of its tasks, evaluate causes of action that an estate might bring, to determine whether such actions are worth the estate's pursuing. Its consultations with its counsel in this regard are properly privileged. The committee might conclude that one or more such actions in fact ought to be brought. It might request the debtor-in-possession to do so. The debtor-in-possession might, for one reason or another, decide not to bring suit. The committee then may petition the bankruptcy court for permission to bring the lawsuit *on behalf of the estate. See Official Comm. Of Equity Security Holders of Adelphia Communications Corp. v. Official Comm. Of Unsecured Creditors of Adelphia Communications Corp. (In re Adelphia Communications Corp.),* 544 F.3d 420, 424 (2nd Cir. 2008); *see also Commodore Int'l, Ltd. V. Gould (In re Commodore Int'l Ltd.),* 262 F.3d 96, 100 (2nd Cir. 2001); *Louisiana World Exposition v. FDIC,* 858 F.2d 233, 247 (5th Cir. 1988); *Torch Liquidating Trust v. Stockstill,* 2009 U.S. App. LEXIS 5339 (5th Cir. Feb. 23, 2009).  If the court grants the relief, the Committee may then file the suit, with the Committee named as plaintiff. It may use its own counsel to represent it in the action. But the resulting suit is essentially derivative in nature. Any recovery would not go to the Committee, or even directly to unsecured creditors. It would instead go to the estate, for distribution either in accordance with the distribution scheme set out in the Code (in the event of a chapter 7 liquidation) or in accordance with the provisions of a confirmed plan (in the case of a chapter 11).

Signature believes that the Trustee is asserting causes of action for which he does not have standing, and points to the Fifth Circuit's recent decision in *In re Seven Seas Petroleum,* 522 F.3d 575, 584 (5th Cir. 2008). That case involved an action brought by a single creditor, not on behalf of the estate, but on its own behalf. The court ruled that the creditor had standing to

bring the action because it did not belong to the bankruptcy estate.  Here, the cause of action *does* (or did) belong to the estate. The action could have been brought pre-confirmation by the debtor-in-possession, or (with the court's permission) by the Committee on behalf of the estate. *Seven Seas* has nothing to say about these facts.  That case dealt not with the assertion of a derivative claim on behalf of the estate, but a *direct* claim on behalf of a creditor. The standing analysis is very different in the latter context. *See Seven Seas,* 522 F.3d, at 584. It is not applicable to this case.

We turn then to whether the Reports are themselves privileged. The burden to establish the elements of the attorney-client privilege lies with the party claiming the privilege. *Ferko v. NASCAR, Inc.*, 218 F.R.D. 125, 134 (E.D. Tex. 2003) (Schell, J.).  That party also has the burden to prove that waiver did not occur. *Id.* The elements a party must establish to claim the attorney-client privilege are:

> (1) the asserted holder of the privilege is or sought to become a client;
> (2) the person to whom the communication was made is
>> (a) a member of a bar of a court, or his subordinate, and
>> (b) in connection with this communication is acting as a lawyer;
> (3) the communication relates to a fact of which the attorney was informed
>> (a) by his client
>> (b) without the presence of strangers
>> (c) for the purpose of securing primarily either
>>> (i) an opinion on law or
>>> (ii) legal services
>>> (iii) or assistance in some legal proceeding, and
>> (d) not for the purpose of committing a crime or tort; and
> (4) the privilege has been
>> (a) claimed and
>> (b) not waived by the client.

*Ferko*, 218 F.R.D. at 133-34.  While normally disclosure to third parties waives the privilege, an exception applies for disclosures to accountants or other professionals hired to assist the

lawyer in providing legal advice to the client. *Id.* at 134-135 (citing *United States v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961) and saying that "[t]his circuit [Fifth], like most, has adopted the *Kovel* test.").[5] "This exception, however, only applies when communications are made 'for the purpose of obtaining legal advice *from the lawyer*.'" *Id.* at 135 (emphasis original). The third-party professional must have been hired for a specific purpose, which significantly relates to the disputed communications. *Id.* Thus, the third-party professional's services must have "enabled the giving of legal advice." *Id.* In turn, in defining 'legal advice,' one court explained that

> [i]t is not easy to frame a definite test for distinguishing legal from nonlegal advice. . . . [T]he most that can be said by way of generalization is that a matter committed to a professional legal adviser is prima facie so committed for the sake of the legal advice which may be more or less desirable for some aspect of the matter, and is therefore within the privilege unless it clearly appears to be lacking in aspects requiring legal advice.

*SEC v. Brady*, 238 F.R.D. 429, 439 (N.D. Tex. 2006) (citing *Diversified Indus., Inc. v. Meredith*, 572 F.2d 596, 610 (8th Cir. 1977) (quoting 8 Wigmore, Evidence § 2296 (McNaughton rev. 1961)).

It is argued by the defendants in this case that communications to third party professionals can only be protected when it is the *attorney* who has hired them – that it is lost if the professional is hired by the client. The assertion is not supportable by either law or logic. The attorney-client privilege "encompasses contacts between the attorney and a client's agent or representative and between the client and the attorney's agents, provided that the communications are intended to facilitate the provision of legal services by the attorney to the

---

[5] In *United States v. Kovel*, 296 F.3d 918, 921 (2d. Cir. 1961), the court

> set out four factors that must be met for the attorney-client privilege to extend to third parties: 1) third party must be an agent of the attorney; 2) third party must facilitate the communication between the attorney and the client for legal advice; 3) communications with the third party must be kept confidential; 4) the privilege must not be waived. *Kovel* 296 F.2d at 921.

*Tri-State Outdoor Media Group, Inc. v. Official Comm. Of Unsecured Creditors (In re Tri-State Outdoor Media Group, Inc.)*, 283 B.R. 358, 362 (Bankr. M.D. Ga. 2002).

client." *Byrnes v. Empire Blue Cross Blue Shield*, 1999 U.S. Dist. LEXIS 17281, at *6 (S.D.N.Y. Nov. 4, 1999); *see also Ferko,* 218 F.R.D., at 140 n. 15 ("If the client instead of the attorney hires a financial professional, the attorney client privilege protects communications between the attorney and that financial professional if that financial professional is effectively an employee of the client").

This proposition is especially true in the bankruptcy context because, pursuant to 11 U.S.C. §§ 327, 330, third party professionals such as financial advisors, *must* be hired by the bankruptcy estate, or risk not being compensated for their services. *See Silverman v. Hidden Villa Ranch (In re Suprema Specialties, Inc.)*, 2007 Bankr. LEXIS 2304, at *12 n.5 (Bankr. S.D.N.Y., Jul. 2, 2007) (Peck, J.). In the context of a bankruptcy, a debtor's attorney would <u>never</u> be the one to hire an accountant for work that such an accountant would perform on behalf of the estate – even when the work is for the purpose of facilitating client and attorney communications. In *In re Suprema Specialties*, in response to an argument made by the defendant seeking to compel discovery that an accountant's work product could not be privileged just by saying that the attorneys retained such accountant and did the investigation, Judge Peck responded:

> This statement deals with the formalities of the retention process, but otherwise ignores *Kovel* and subsequent cases that make quite clear that accountant work product can be privileged if the accountant's role was, as here, to clarify communications between the attorney and the client. The Court in this decision does not directly address the question of whether retention by the client directly, should make any difference with respect to the protection afforded an accountant's work product. … [When an accountant is retained by the attorney instead of the client,] such a retention may augment an argument based on *Kovel* that the accountant, having been retained by counsel has a role here that may be analogous to that of an interpreter.

17

2007 Bankr. LEXIS 2304, at *12-13. The argument that the A&M Report cannot be privileged because it was the debtors, and not their counsel, who hired them must be rejected because it misapprehends the reason for allowing such communications in the first place – to facilitate communications. It has, literally, nothing to do with who hired them.

Adams argument is different. Adams claims that A&M did not assist L&B in providing legal advice to the debtors, so the exception should not apply. *Adams Resp.*, at 8-9. Adams simply got it wrong with respect to the role A&M played in this bankruptcy. A&M was specifically tasked with investigating possible estate causes of action; thus, there is no question that A&M was hired to facilitate L&B's provision of legal services to the debtors. A&M's role was analogous to that of an interpreter between the L&B and the debtors. This court follows the ruling and the logic of Judge Peck in *Suprema Specialties*, holding that disclosures to firms such as A&M, when they are acting as "interpreters" between client and lawyer do not result in a waiver of the attorney-client privilege. Barring a waiver of the privilege on some other basis, the A&M Report, prepared to aid the communications between the debtor and its counsel in evaluating potential causes of action, is a privileged attorney-client communication.  Moreover, any disclosures made to A&M do not constitute a waiver of the privilege.

Another exception to the waiver-by-disclosure rule is the common interest doctrine. *U.S.A. v. BDO Seidman, LLP*, 492 F.3d 806, 815 (7th Cir. 2007).  The doctrine applies "where the parties undertake a joint effort with respect to a common legal interest, and the doctrine is limited strictly to those communications made to further an ongoing enterprise." *Id.* at 815-816. The Fifth Circuit requires a palpable threat of litigation for the common interest doctrine to apply. *Id.* at 816 n.6 (citing *U.S. v. Newell*, 315 F.3d 510, 525 (5th Cir. 2002)).  The purpose of

18

the common interest exception goes hand-in-hand with the purpose of the attorney-client privilege:

> to 'encourage full disclosure and to facilitate open communication between attorneys and their clients.'... Open communication assists lawyers in rendering legal advice, not only to represent their clients in ongoing litigation, but also to prevent litigation by advising clients to conform their conduct to the law and by addressing legal concerns that may inhibit clients from engaging in otherwise lawful and socially beneficial activities.

*Id.* at 815; *United States v. Impastato*, 2007 U.S. Dist. LEXIS 63454, at *5 (E.D. La. Aug. 28, 2007) ("'[t]he attorney-client privilege is the oldest of the privileges for confidential communications known to common law,' and '[i]ts purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interest in the observance of law and administration of justice.'" (citing *U.S. v. El Paso Co.*, 682 F.2d 530, 538 (5th Cir. 1982)). "A court must be cognizant of these policies because '[t]he scope of the attorney-client privilege is shaped by its purposes.'" *Id.* (citing *United States v. Pipkins*, 528 F.2d 559, 563 (5th Cir. 1976)). However, because the Fifth Circuit requires (at least) pending litigation for the common interest doctrine to apply, *U.S. v. Newell*, 315 F.3d at 525 ("a cognizable common legal interest does not exist if a group of individuals seeks legal counsel to avoid conduct that might lead to litigation, but rather only if they request advice to 'prepare for future litigation.'"), the application of the common interest doctrine is likely limited to encouraging open communication to assist the lawyer in providing legal advice in the face of pending or existing litigation. "Bankruptcy itself constitutes 'litigation' for purposes of delineating privilege." *Brown v. Adams (In re Fort Worth Osteopathic Hosp., Inc.)*, 2008 Bankr.

LEXIS 3156, at *44 (Bankr. N.D. Tex. Nov. 14, 2008) (Lynn, J.);[6] *see also Tri-State Outdoor Media Group, Inc. v. Official Comm. Of Unsecured Creditors (In re Tri-State Outdoor Media Group, Inc.)*, 283 B.R. 358, 364 (Bankr. M.D. Ga. 2002) (saying that "[w]hile Bankruptcy is not entirely litigation, it is an adversarial proceeding, particularly when considering the rights of the debtor versus the rights of an unsecured creditor.")

Notwithstanding Adams' and Signature's arguments to the contrary, the common interest doctrine can apply to plaintiffs as well as to defendants *See In re Grand Jury Subpoenas, 89-3 and 89-4, John Doe 89-129*, 902 F.2d 244, 249 (4th Cir. 1990). Additionally, in *Grochocinski v. Mayer Brown Rowe & Maw LLP*, 251 F.R.D. 316, 2008 U.S. Dist. LEXIS 45011, *26-27 (N.D. Ill. Jun. 9, 2008), the Northern District of Illinois court said that

> [i]t generally applies to 'any parties who have a 'common interest' in current or potential litigation, either as actual or potential plaintiffs or defendants.' In order to maintain the privilege, 'the common interest must relate to a litigation interest, not merely a common business interest.' Whether the common interest doctrine applies to a privileged document 'depends upon the reason for disclosure, and not when the document was created.' The common interest rule is not limited to parties who are perfectly aligned on the same side of a single litigation, rather the party asserting the privilege must simply demonstrate actual cooperation toward a common legal goal with respect to the documents they seek to withhold. However, this shared interest must be identical, not simply similar. Before asserting the doctrine, however, the parties must first establish that the underlying documents withheld were otherwise privileged before the common interest doctrine arose. Once such a privilege is established, the party asserting the privilege then has the burden of proving the common interest.

(citing *Dexia Credit Local v. Rogan*, 231 F.R.D. 268, 273 (N.D. Ill. 2004) ("the common interest doctrine more generally applies to any parties who have a 'common interest' in current or potential litigation, either as actual or potential plaintiffs or defendants."); *see also LaSalle Bank*

---

[6] Although Judge Lynn was discussing the Texas work product privilege when he made this statement, *Id.*, at *43-44, the court feels that it applies equally to the litigation element of applying the common interest exception in the Fifth Circuit. After all, litigation is litigation.

*Nat'l Ass'n v. Lehman Bros. Holdings, Inc.,* 209 F.R.D. 112, 116 (D. Md. 2002) (upholding plaintiff's assertion of the common interest doctrine with respect to both the attorney-client privilege and the work product doctrine). Likewise, Weinstein's Federal Evidence does not distinguish between the assertion of the doctrine by a plaintiff or a defendant. 3-503 Weinstein's Federal Evidence § 503.21 ("The lawyer-client privilege applies to communications made by the client or the client's ''lawyer to a lawyer representing another in a matter of common interest'''"). Ultimately, based upon the longstanding policy that open and full communications between a lawyer and a client should be encouraged – regardless of whether the client is a plaintiff or a defendant – so long as the parties are preparing for litigation, there is no reason that the common interest exception should not apply equally to plaintiffs and defendants.

The Trustee has properly asserted the common interest doctrine as between the debtors, the Committee, and the Banks here. It is uncontested that, in connection with resolving their issues for final approval of the DIP financing, the debtors, the Committee and the Banks agreed to join forces for the ultimate purpose of confirming a liquidating plan of reorganization that recovered and distributed the debtors' assets, and arranged for the pursuit of causes of action held by the estate. In pursuit of that strategy the debtor hired A&M for the purpose of analyzing the debtors' causes of action. By the time the debtors hired A&M in May 2006, and subsequently when the A&M Report was shared, the three entities were working towards the common – and ultimately successful – goal of identifying and pursuing the debtors' causes of action. In fact, the Lenders had agreed to fund a large portion of the debtors' bankruptcy and post-confirmation expenses, *Discl. Stmnt.* at 16-17, 19, and in September 2006,

the court granted the Committee – with the consent of the debtors and the Lenders – standing to pursue certain of the estate's causes of action.  Also in September 2006, the debtors hired both H&B as well as L&B to initiate preference and avoidance causes of action on behalf of the estate. Clearly, beginning with the settlement of the DIP financing issues,[7] the parties were already working in concert to recover, through litigation, causes of action of the estate for the benefit of the estate's creditors. The common legal goal of investigating and recovering the debtors' assets existed between the debtors, the Committee, and the Banks – the only parties whom saw the A&M Report – the common interest doctrine applies in this case.

For the reasons stated above, the court finds that the Trustee has met his burden of showing that both Reports are protected by the attorney-client privilege and that the privilege was not waived. The Trustee is now the holder of the privilege of both the debtors and the Committee and may thus assert such privilege as to both Reports. As the H&B Report was not given to the Trustee until the Committee's interests passed to the Trustee, the H&B Report was not disclosed to third parties, so the attorney-client privilege was not waived.  As for the A&M Report, although the debtors, and not L&B, hired A&M, A&M acted as an interpreter for communications that took place between the debtors and L&B and, therefore, the A&M Report is protected by the attorney-client privilege.  Moreover, the debtors, the Committee and the Banks had a common interest in determining and pursuing litigation that belonged to the debtors' estate and, for this reason, the attorney-client privilege was not waived when the A&M Report was shared amongst these parties.[8]

---

[7] The court approved and entered the Final DIP Order after a February 10, 2006 hearing.
[8] The Court disagrees with the argument that when the Trustee shared the Reports with potential attorneys that the Trustee was interviewing to hire to pursue this litigation, the Trustee waived the attorney-privilege.  One of the

*Work Product Doctrine*

Whether a document is protected from discovery by attorney work product is a fact intensive determination.

> [A] court must determine 'whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation,' 8 Wright & Miller, Federal Practice and Procedure, P 2024, at 198 [footnote omitted], or whether it must be deemed to have been prepared in the company's ordinary course of business.

*Devaney v. Chester*, 1986 U.S. Dist. LEXIS 26096, at *51-52 (S.D.N.Y. Apr. 29, 1986) (citations omitted). Because there is no hard and fast rule, a court must undertake a case-by-case analysis of each of the documents sought to be protected.

> The federal work product doctrine has been incorporated into the Federal Rules of Civil Procedure. Specifically, Rule 26 provides(A) Documents and Tangible Things. Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent). But, subject to Rule 26(b)(4), those materials may be discovered if:

> > (i) they are otherwise discoverable under Rule 26(b)(1); and

> > (ii) the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.

> (B) Protection Against Disclosure. If the court orders discovery of those materials, it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation.

FRCP 26(b)(3)(A)-(B). "Unlike the attorney-client privilege, the work product privilege is held by both the client and the attorney and may be asserted by either one." *Searcy v. Rigby (In re*

---

elements of attorney-client privilege is that the asserted holder of the privilege (the Trustee) is or *sought to become* a client. Thus, the privilege is not waived in those instances.

*Rigby)*, 199 B.R. 358, 362 (Bankr. E.D. Tex. 1995) (*citing In re Grand Jury Proceedings*, 43 F.3d 966, 972 (5th Cir. 1994)); *In re Grand Jury Subpoena*, 419 F.3d 329, 333 n. 3 (5th Cir. 2005) (same). Additionally, the "work-product doctrine… differs from the attorney-client privilege in that it serves to promote the adversary system." *Varel v. Banc One Capital Partners*, 1997 U.S. Dist. LEXIS 4711, at *8 (N.D. Tex. Feb. 25, 1997). A party resisting discovery based on this doctrine has the burden of showing that the materials are, in fact, work product by establishing four elements. *Ferko*, 218 F.R.D. at 136.

> First, the materials must be documents or tangible things. See 8 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & RICHARD L. MARCUS, FEDERAL PRACTICE AND PROCEDURE § 2024, at 336 (2d ed. 1994). Second, the materials must be prepared in anticipation of litigation or for trial. In other words, the party had reason to anticipate litigation and 'the primary motivating purpose behind the creation of the document was to aid in possible future litigation.' *In re Kaiser Aluminum & Chem. Co.*, 214 F.3d 586, 593 (5th Cir. 2000) (citation and footnote omitted). Third, the materials must be prepared by or for a party's representative. FED. R. CIV. P. 26(b)(3). Fourth, if the party seeks to show that material is opinion work-product, that party must show that the material contains the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party.

*Id.* at 136.  To reiterate, the work product doctrine may apply "where litigation is not imminent, 'as long as the primary motivating purpose behind the creation of the document was to aid in possible future litigation.'" *SEC v. Brady*, 238 F.R.D. 429, 441-442 (N.D. Tex. 2006).  "'Work product remains protected even after the termination of the litigation for which it was prepared' and such protection extends to 'closely related' subsequent litigation regarding the underlying suit." *Simmons Foods, Inc. v. Willis*, 196 F.R.D. 610, 612 n.5 (D. Kan. 2000).

If the party seeking to preclude discovery is successful in showing that the materials are protected by work product, the burden then shifts to the opposing party to establish that, notwithstanding that designation, the materials should still be produced. *SEC v. Brady*, 238

F.R.D. at 443 (citing *Ferko*, 219 F.R.D. at 396). A party may certainly waive the work-product objection, although, unlike the attorney-client privilege, it takes more than mere disclosure to a third party. *Id.* Instead, courts find that a party has waived a work product objection "if work-product is disclosed to adversaries or treated in a manner that substantially increases the likelihood that an adversary will come into possession of the material." *Id.* And, also unlike the attorney-client privilege, the burden of showing waiver falls on the party asserting that a waiver occurred. *Id.*

The Fifth Circuit recognizes a distinction between ordinary and opinion work product. *SEC v. Brady*, 238 F.R.D. at 442. Opinion work product, which is the mental impressions, conclusions, opinions, or legal theories of lawyers or other representative of the party that is in litigation, has "'almost absolute protection...'" *Id.* Examples of opinion work product include investigatory reports (containing summaries of witness interviews) "documents, including business records, that were specifically selected and compiled by a party or its representative in preparation for litigation are opinion work product because the mere acknowledgment of their selection would reveal mental impressions concerning the potential litigation." *Id.* If the material sought is opinion work product, the party seeking the materials must establish "a compelling need for the information... [which is] nearly an absolute protection of opinion work product." *Id.* [9] What constitutes a compelling need is not defined in any case that this court could find. It is clearly something more than either "substantial need" or "undue hardship." *See SEC v. Brady*, 238 F.R.D. at 443-444; *Simmons Foods, Inc. v. Willis*, 196 F.R.D. at 613.

---

[9] When the opinion work product itself is an issue in the case or in the case of a crime-fraud exception, opinion work product has been ordered disclosed. *Id.* (citations omitted); *Helen of Troy Ltd. v. John Paul Mitchell Sys.*, 2007 U.S. Dist. LEXIS 49100, at *22 (W.D. Tex. Jun. 26, 2007) (same). Of course, these are not the facts of this case.

If the material sought is *ordinary* work product, a court may compel discovery if the party seeking the materials establishes that (i) it has a substantial need for the materials in the preparation of the party's case, and (ii) it is unable, without undue hardship, to obtain the equivalent of the materials by other means. *Id.* at 443 (citing *Ferko*, 218 F.R.D. at 236). To show either substantial need or undue hardship, a party seeking discovery of ordinary work product must make a detailed showing of either need or hardship; a broad, unsubstantiated assertion is not sufficient. *Koenig v. Int'l Sys. & Controls Corp. Secs. Litig. (In re Int'l Sys. & Controls Corp. Secs. Litig.)*, 693 F.2d 1235, 1240 (5th Cir. 1982). Undue hardship can be demonstrated if witnesses cannot remembe key facts or are unavailable for depositions or if there is unusual expense incurred of interviewing or discovering the sought-after person or information, as the case may be. *Id.* at 1240-1241; *SEC v. Brady*, 238 F.R.D. at 443. Substantial need may be shown where the information is only discoverable with the documents at issue themselves. *Id.* at 1241; *see also In re Suprema Specialties, Inc.*, 2007 Bankr. LEXIS 2304, at *11 (substantial need means unavailable witnesses due to reasons such as death, faulty memory because of brain damage, or a witness being outside of the court's reach.). In *Koenig*, the court said that if the district court finds that the information can be discovered other than through the documents at issue, then substantial need does not exist. 693 F.2d at 1241.

In *Brady*, subsequent to being sued by some shareholders and being contacted by former officers with allegations of wrongful conduct, i2 Technologies ("i2") hired Baker Botts to "conduct an internal investigation and give legal advice concerning the potential claims against i2." *Id.* at 434. Baker Botts then hired KPMG, LLP to assist in its investigation by providing accounting advice and expertise. *Id.* During this initial investigation, Baker Botts reviewed

around 40,000 documents and interviewed around 70 people. *Id.* Ultimately, a Phase I Report was created. *Id.* Later, in a continuation of the investigation, Baker Botts reviewed additional documents and conducted additional interviews. *Id.* at 435. As a result of the continued investigation, Baker Botts gave a confidential oral presentation to i2's board and audit committee. *Id.* In ruling that the Phase I Report, as well as the documents and interviews upon which its conclusions were based were work product, the court held that these "documents were specifically selected by Baker Botts or its agent, KPMG, to analyze the allegations and create the Phase I Report… [and] the production of these documents would reveal the mental impressions of both Baker Botts and its agent, KPMG." *Id.* at 443.

The Reports in this case are both protected under the work product doctrine. As in *Brady*, the Reports were prepared by H&B and A&M in anticipation of litigation and constitute both H&B's and A&M's mental impressions and strategies with regard to this litigation. Thus, both Reports are opinion work product. Even though the Debtors and the Committee no longer exist, the Trustee is the successor-in-interest and succeeds to their right to assert the privilege. The Reports do not cease to be opinion work product simply because a plan has been confirmed.

In response, Signature and Adams claim that they have a substantial need for the Reports and that they will suffer undue harm if the Reports are not produced. Saying does not make it so, however, and the mere assertion that life would be easier if only they had access to the Reports is insufficient to qualify for the undue hardship exception to the work product doctrine. More importantly, neither party has presented anything close to a case for "compelling circumstances" sufficient to justify an invasion of opinion work product. *Simmons*

27

*Foods, Inc. v. Willis*, 196 F.R.D. at 613. *SEC v. Brady*, 238 F.R.D. at 442. Therefore, Signature's and Adams' request that the court compel the Trustee to produce the Reports is denied.

In any event, even if the Reports were ordinary work product, Signature and Adams' self-serving, broad statements are insufficient for the court to find such harm and justify compelling production of the Reports. *See id.* at 443-444 (saying that "broad unsubstantiated assertions of unavailability or faulty memory are insufficient to show undue hardship."). Signature states that the only documents that can support the Trustee's allegations are contained in the Reports. But, in the same breath, Signature concedes that other documents supporting the Trustee's allegations are contained in three hundred boxes which are in the Trustee's possession (and which, according to the Trustee, have been made available to the defendants). *Signature Response*, at ¶ 10. And, as noted above, the Trustee states that he will be able to prove up his case without using the Reports. *Reports Mot.*, at 3-4. Similarly, Adams only argues that he is has a substantial need for the Reports and will be harmed if they are not produced. *Adams Response*, at 9-10. Adams says that because a bankruptcy trustee is the plaintiff in this case, and bankruptcy trustees generally have little or no personal knowledge of the facts underlying their allegations, the defendants are in a unique situation in which they do not have an opposing party with substantial knowledge of the facts whom they may question or depose. *Id.* Although Adams does not articulate what undue burden he would be subjected to if the Reports are not produced, one can speculate that, like Signature, neither party wants to dig through 300 boxes of documents.[10]

---

[10] There is also the irony that Adams and Vann were principals of the various corporate entities whose transactions form the basis of the Trustee's complaint. Corporations, of course, act through their principals. Thus, of all the players in this action, Adams and Vann are likely to have the *most* information about the factual underpinnings of this litigation.

The court notes that "work product immunity only protects the documents and not the underlying facts, thus, if a party can procure the information sought through other avenues, ... then undue hardship has not been shown." *SEC v.* Brady, 238 F.R.D. at 443. Here, the defendants have been offered access to the very same materials that the Trustee or his predecessors in interest have already reviewed. Neither Signature nor Adams provided the court with any details of "undue hardship" they would suffer as a result of having to look through the source documents underlying the Trustee's allegations – the very documents the Trustee and his professionals had to look through. There has been no showing of undue hardship, and, more likely than not, no actual undue hardship either (which may explain why there has been no showing). Moreover, neither Signature nor Adams has alleged that witnesses are unable to recall key facts or that they are unavailable for deposition. *See In re Int'l Sys. & Controls Corp. Sec. Litig.*, 693 F.2d at 1241 (noting that although the defendant spent up to $1.5 million in investigating its affairs and creating the binders that were the subject of the discovery dispute in that case, the plaintiff may have been able to discover much of the information at a lower cost to itself, and that the plaintiff was really only inquiring into a number of specific transactions.) Insofar as substantial need is concerned, the facts underlying the Trustee's allegations are easily discoverable through sources other than the Reports, *to wit*, the boxes of materials that the Trustee has made available to the defendants. *See id.* (saying that the "district court should determine ... [whether the information] can be discovered without the work product – i.e. by deposition testimony or through the regular audit information."). Neither Signature nor Adams have disagreed that the facts underlying the Trustee's allegations are contained in the Trustee's boxes; they only argue that the effort of going through those

boxes constitutes undue hardship. That is a dog that won't hunt. The fact that the defendants would prefer to work off the opponents work product hardly makes the case for "undue hardship." It is not an undue hardship that the defendants have to do their own work.

The Reports Motion claim of work-product privilege is proper, and is accordingly granted.

**2. The Trustee's Motion for Protective Order (the "Signature Protection Motion")**

On September 16, 2008, the Trustee filed a Motion for Protective Order (the "Signature Protection Motion") [Docket No. 76] seeking the court's protection from certain discovery requests made by defendants Signature Mouldings & Millworks, Inc. and Signature Partners, Ltd. (collectively, "Signature"). On October 8, 2008, the Trustee filed a supplement to his Signature Protection Motion [Docket No. 85] in which the Trustee provided the court with the Trustee's responses and objections to Signature's first request for admissions and the Trustee's responses and objections to Signature's first set of written interrogatories. Signature had not filed a response to the Signature Protection Motion by the October 14 hearing date and, at such hearing, the court instructed Signature to file a response by Friday, October 17, 2008. On October 16, 2008, Signature filed a response to the Trustee's Signature Protection Motion [Docket No. 87].

The Trustee filed the Signature Protection Motion pursuant to Fed. R. Civ. P. 26(c)(1), made applicable herein by Fed. R. Bankr. P. 7026, and requests that the court "enter an order protecting Trustee from discovery related to the pre-suit investigation and due diligence performed by Trustee and his counsel." *Signature Protection Mot.*, at 1. More specifically, the Trustee alleges that the information sought by Signature in Signature's request for admissions 1-5, 19, and 27-30 and in Signature's interrogatories 2 and 17 is protected by the work-product

doctrine. *Id.*, at 2-4. The following are the requests for admission and interrogatories at issue in this motion:

**REQUESTS FOR ADMISSION TO PLAINTIFF**

**REQUEST FOR ADMISSION NO. 1:**

Admit or deny that you did not take any witness statements in this case prior to the Complaint being filed.

**RESPONSE:**

Plaintiff objects to this Request for Admission for the reasons set forth in his Motion for Protective Order and because it seeks information not subject to disclosure and protected by the work product doctrine. Plaintiff also objects that the requested information is irrelevant to the causes of action asserted in this lawsuit and is not reasonably calculated to lead to the discovery of admissible evidence.

**REQUEST FOR ADMISSION NO. 2:**

Admit or deny that no witness statements were taken on your behalf in this case prior to the Complaint being filed.

**RESPONSE:** [Identical to the Trustee's response to Request for Admission No. 1.]

**REQUEST FOR ADMISSION NO. 3:**

Admit or deny that you have not interviewed any person with knowledge of the relevant facts made the basis of the Complaint.

**RESPONSE:** [Identical to the Trustee's response to Request for Admission No. 1.]

**REQUEST FOR ADMISSION NO. 4:**

Admit or deny that no person with knowledge of the relevant facts was interviewed on your behalf regarding the allegations made in the Complaint.

**RESPONSE:** [Identical to the Trustee's response to Request for Admission No. 1.]

**REQUEST FOR ADMISSION NO. 5:**

Admit or deny that an investigation was not performed, in compliance with Federal Rule of Civil Procedure 11, by you or on your behalf regarding the facts at issue in this case before this case was filed.

**RESPONSE:** [Identical to the Trustee's response to Request for Admission No. 1.]

**REQUEST FOR ADMISSION NO. 19:**

Admit or deny that you or someone on your behalf investigated the relationship between Signature Mouldings and Custom Forest Products prior to filing the Complaint in this matter.

**RESPONSE:** [Identical to the Trustee's response to Request for Admission No. 1.]

**REQUEST FOR ADMISSION NO. 27:**

Admit or deny that you interviewed Tony Smith before filing this lawsuit.

**RESPONSE:** [Identical to the Trustee's response to Request for Admission No. 1.]

**REQUEST FOR ADMISSION NO. 28:**

Admit or deny that you interviewed Donald Vann before filing this lawsuit.

**RESPONSE:** [Identical to the Trustee's response to Request for Admission No. 1.]

**REQUEST FOR ADMISSION NO. 29:**

Admit or deny that you interviewed any representative of Akin Doherty Klein & Feuge before filing this lawsuit.

**RESPONSE:** [Identical to the Trustee's response to Request for Admission No. 1.]

**REQUEST FOR ADMISSION NO. 30:**

Admit or deny that you interviewed any representative of Webster Business Credit Corporation before filing this lawsuit.

**RESPONSE:** [Identical to the Trustee's response to Request for Admission No. 1.]

<u>**INTERROGATORIES TO PLAINTIFF**</u>

**INTERROGATORY NO. 2:**

Identify all individuals and/or entities that have knowledge of relevant facts relied upon by Trustee within the Complaint.

**RESPONSE:**

Plaintiff objects to this interrogatory for the reasons set forth in his Motion for Protective Order, which is incorporated herein. The request for information seeks disclosure of information protected by the attorney-client privilege and work product doctrine because, among other reasons, it inquires into the Plaintiff's mental processes and litigation strategy. Plaintiff further objects on the basis that the interrogatory is vague. If Signature simply seeks the identity of persons who have knowledge of relevant facts, Trustee also objects to this interrogatory as overly burdensome and expensive to comply with given the large number of people who worked at or did business with Custom Forest Products and/or the defendants and who may have knowledge of relevant facts. Subject to these objections, the General Objections and the Motion for Protective Order, Plaintiff responds as follows: … [the court omits the remainder of the Trustee's response]

**INTERROGATORY NO. 17:**

Identify all persons interviewed by you or by someone on your behalf as part of this suit.

**RESPONSE:**

Plaintiff objects to this interrogatory for the reasons set forth in his Motion for Protective Order, which is incorporated herein. The request for information seeks disclosure of information protected by the attorney-client privilege and work product doctrine because, among other reasons, it inquires into the Plaintiff's mental processes and litigation strategy.

*Supplement to Signature Protection Mot.*, Exs. A, B. In support of his request for a protective order, the Trustee cites to *Electronic Data Sys. Corp. v. Steingraber*, 2003 WL 21653405, at *1-2 (E.D. Tex. Jul. 9, 2003) for the proposition that the identity of the individuals that the Trustee interviewed with regard to the relevant allegations in the case are non-discoverable due to the work product doctrine. Because both the requests for admission and the interrogatories at issue in this motion seek just such information – namely, the identity of any persons

interviewed by the Trustee prior to filing his complaint in this adversary proceeding – the discovery invades work product, entitling the Trustee to a protective order.

In response, Signature argues that it has not requested anything that would be protected by the work product doctrine since it has only requested facts from the Trustee. In Signature's words,

> The discovery requests at issue do not ask for 'documents or tangible things.' Rather these requests are attempting to illicit from the Trustee certain facts; including the persons interviewed in his investigation into this matter, whether any witnesses interviews occurred, and whether a pre-suit investigation occurred.

*Signature Resp.*, at 3.  Signature asks the court not to enter a protective order and to direct the Trustee to answer the requests at issue. *Id.*  For support, Signature relies on a number of cases, most notably *Brody v. Zix Corp.*, 2007 U.S. Dist. LEXIS 38230 (N.D. Tex. May 25, 2007), *Mazur v. Lampert*, 2007 U.S. Dist. LEXIS 20750 (S.D. Fla. Mar. 25, 2007), *Miller v. Ventro Corp.*, 2004 U.S. Dist. LEXIS 6913 (N.D. Cal. Apr. 21, 2004), *In re Aetna Inc. Sec. Litig.*, 1999 U.S. Dist. LEXIS 8038 (E.D. Pa. 1999).

### a. Legal Standards: Protective Orders Under Federal Rule of Civil Procedure 26(c) and the Attorney Work Product Doctrine

Rule 26 of the Federal Rules of Civil Procedure provides a mechanism by which a party may seek a protective order. It states the following:

> (1) In General. A party or any person from whom discovery is sought may move for a protective order in the court where the action is pending--or as an alternative on matters relating to a deposition, in the court for the district where the deposition will be taken. The motion must include a certification that the movant has in good faith conferred or attempted to confer with other affected parties in an effort to resolve the dispute without court action. The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following:

34

(A) forbidding the disclosure or discovery;

(B) specifying terms, including time and place, for the disclosure or discovery;

(C) prescribing a discovery method other than the one selected by the party seeking discovery;

(D) forbidding inquiry into certain matters, or limiting the scope of disclosure or discovery to certain matters;

(E) designating the persons who may be present while the discovery is conducted;

(F) requiring that a deposition be sealed and opened only on court order;

(G) requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way; and

(H) requiring that the parties simultaneously file specified documents or information in sealed envelopes, to be opened as the court directs.

(2) Ordering Discovery. If a motion for a protective order is wholly or partly denied, the court may, on just terms, order that any party or person provide or permit discovery.

(3) Awarding Expenses. Rule 37(a)(5) applies to the award of expenses.

FED.R.CIV.P. 26(c)(1)-(3).  "Good cause and a specific need for protection" must be established

by the party seeking a protective order." *Ferko v. NASCAR*, 218 F.R.D. 125, 133 (E.D. Tex. 2003).

Good cause is established when

… justice requires the protection of 'a party or person from annoyance, embarrassment, oppression, or undue burden or expense.' The burden is upon the movant to prove the necessity of a protective order, 'which contemplates a particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements.' If both of these requirements are proven, the court may 'make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden and expense.' If a district court denies a motion for a protective order in whole or in part, the court

> may, 'on such terms and conditions as are just, order that any party or other person provide or permit discovery.'  In deciding whether to grant a motion for a protective order, the court has significant discretion.

*Id.* (citations omitted). The Trustee is seeking relief under Rule 26(c)(1) by asserting the work product doctrine, a doctrine which has already been discussed in greater detail earlier in Section 2 of this opinion. *Supra*, at 23-26.

    **b.  The interrogatories and requests for admission at issue seek protected work product and are not discoverable by Signature**

       There appears to be a split in district court decisions – none of which are binding precedent – as to whether the identification of witnesses or persons is protected by work product. *Brody v. Zix Corp.*, 2007 U.S. Dist. LEXIS 38230, at *4-5 (noting the split and collecting cases). One line of cases finds that revealing the identity of interviewees by an opposing party reveals that party's litigation strategy, which is protected work product. *See, e.g., Electronic Data Systems Corp. v. Steingraber,* 2003 U.S. Dist. LEXIS 11818, 2003 WL 21653405 at *2 (E.D. Tex. Jul. 9,2003); *In re Ashworth, Inc., Sec. Litig.,* 213 F.R.D. 385, 389 (S.D. Cal. 2002); *In re MTI Technology Corp. Sec. Litig. II,* 2002 U.S. Dist. LEXIS 13015, 2002 WL 32344347 at *3 (C.D. Cal. Jun. 13, 2002). The other line of cases holds that the work product doctrine does not shield the identity of persons interviewed by the opposing party if those persons have knowledge of relevant facts. *See, e.g., Mazur v. Lampert,* 2007 U.S. Dist. LEXIS 20750, 2007 WL 917271 at *4 (S.D. Fla. Mar. 25, 2007); *Miller v. Ventro Corp.,* 2004 U.S. Dist. LEXIS 6913, 2004 WL 868202 at *2 (N.D. Cal. Apr. 21, 2004); *In re Theragenics Corp. Sec. Litig.,* 205 F.R.D. 631, 635-36 (N.D. Ga. 2002); *In re Aetna, Inc. Sec. Litig.,* 1999 U.S. Dist. LEXIS 8038, 1999 WL 354527 at *3 (E.D. Pa. May 26, 1999).

The court agrees with Signature that the work product doctrine "does not extend to the underlying facts relevant to the litigation…" *See Steingraber*, 2003 U.S. Dist. LEXIS 11818 (citing *Upjohn Co. v. United States*, 229 U.S. 383, 400-402(1981)). However, the rationale of the cases that hold the identity of witnesses to be protected work product is persuasive. *See e.g., Steingraber*, 2003 U.S. Dist. LEXIS 11818, 2003 WL 21653405 at \*2; *In re Ashworth, Inc., Sec. Litig.*, 213 F.R.D. 385; *In re MTI Technology Corp. Sec. Litig. II*, 2002 U.S. Dist. LEXIS 13015, 2002 WL 32344347 at \*3. Granted the identity of interviewees may be independently discoverable. Here, however, the request is effectively that the Trustee disclose who the firms of Alvarez & Marsalis and Haynes & Boone interviewed – the Trustee himself did not conduct any interviews as Signature well knows. When Signature's discovery requests are viewed through that lens, it is plain that what Signature is actually seeking to gain are the "mental impressions and trial strategy…" of opposing counsel. *See Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys.*, 2005 U.S. Dist. LEXIS 43648, at \*16 (N.D. Cal. June 21, 2005).

Furthermore, the court notes that the requests for admission and interrogatories are very broadly cast. They do not ask the Trustee to identify specific persons with knowledge of specific allegations made in the Trustee's complaint – information that of course *is* discoverable. Instead, the discovery aims to find out what the estate's professionals were investigating. The court agrees with the distinction that a number of courts make between discovery requests that are "cast in terms of identification of persons with knowledge… [rather than] identification of persons interviewed by counsel…" *Id.* The former category ("persons with knowledge") are normally found to be either outside of the work product doctrine or "containing minimal work product content." *See In re Aetna Inc. Sec. Litig.*, 1999 U.S. Dist. LEXIS

37

8038, at *5m (E.D. Pa. 1999) *compared to Plumbers & Pipefitters Local 572 Pension Fund*, 2005 U.S. Dist. LEXIS 43648, at *17-21 (finding that interrogatories that asked the plaintiffs to "'identify all persons… who [Plaintiffs] contend to have information supporting' particular allegations…" are not protected work product, *Id.* at *21; and, conversely, finding that interrogatories that requested the plaintiffs to "list 'all persons that they interviewed during the course of their investigation...'" were protected work product. *Id.* at *19). The latter category, on the other hand, does tend to reveal work product, and ought to be proscribed. *See American Floral Servs., Inc. v. Florists' Transworld Delivery Ass'n*, 107 F.R.D. 258 (N.D. Ill. 1985). In *American Floral*, the court compared and distinguished the facts before it to facts it had recently dealt with in another case and said:

> '[Plaintiffs'] legitimate concern is with the identification of persons who have *knowledge* 'concerning meetings, discussions or communications among officers or employees of any competitors with regard to piping construction bids, pricing, customers or territories.' To go beyond that--to tell plaintiffs whom defendants have interviewed, where and when such interviews took place and whether or not a record was made--is to give plaintiffs no more knowledge of substantive relevant facts, but rather to afford them the potential for significant insights into the defense lawyers' preparation of their case (and thus their mental processes). That possibility is enhanced by the broad scope of disclosure otherwise sanctioned in this opinion.'
>
> In that case the disclosure of all persons interviewed, when coupled with the equally inevitable disclosure of which of them were anticipated witnesses (and therefore which were not), would teach the opponent just which interviewees' information was viewed as gold and which as dross. It would teach the shape of the discovered party's case as surely as the shape of a container teaches the shape of the gas within. It would reveal the conceptual sifting of relevant from irrelevant facts, as spoken of in the quoted passage from *Hickman*. That is why this Court spoke in *Board of Education* of 'afford[ing] [one party] the potential for significant insights into the [other party's] lawyers' preparation of their case (and thus their mental processes).'

*Id.* at 261 (emphasis original) (*citing In Board of Education of Evanston Township High School District No. 202 v. Admiral Heating and Ventilating, Inc.*, 104 F.R.D. 23, 32 (N.D. Ill. 1984)).

Signature's reliance on *In re Aetna Inc. Sec. Litig.*, 1999 U.S. Dist. LEXIS 8038 and its progeny is misplaced. If anything, the interrogatories at issue in *Aetna* make the case for the Trustee here. The first interrogatory asked the plaintiffs to "'State the names and addresses of the following persons described in the Complaint…' Each sub-part of Interrogatory No. 1 contains a specific quotation from a specific paragraph of Plaintiff's Second Amended Complaint." *In re Aetna*, 1999 U.S. Dist. LEXIS 8038, at *1-2. Interrogatory No. 2 sought the "identification of supporting witnesses for allegations contained in PP 54-61 and 64-73 of the Second Amended Complaint." *Id.* at *2. These interrogatories tie the disclosure of witnesses to the allegations in the Complaint, not to the interviewing process of counsel. *See also In re Theragenics Corp. Secs. Litig.*, 205 F.R.D. 631, 633 (N.D. Ga. 2002) (compelling plaintiffs to produce the names of witnesses and interviewees that were specifically mentioned in the complaint). Here, Signature's interrogatories fail to link their requests to any paragraph or specific allegation in the Trustee's complaint. Instead, Signature makes broad, overarching requests that relate to the Trustee's investigations as a whole that led to "relevant facts relied upon by Trustee within the Complaint…" *Supplement to Signature Protection Mot.*, Ex. B (Interrogatory No. 2), or information relied upon by the Trustee "as part of this suit." *Id.* Ex. B (Interrogatory No. 17). *See In re Harmonic, Inc. Sec. Litig.*, 245 F.R.D. 424, 428 (N.D. Cal. 2007) (distinguishing the request for the identification of witnesses that were made in that case from the request made in the *Plumbers* case for a list of all persons interviewed during the course of investigating the claims in *Plumbers* and noting that such a "broad request would undoubtedly

provide insight into counsel's thought processes during preparation for litigation." *Id.* at 428).

Similarly, the requests for admission numbers 1 through 4 ask the Trustee to admit or deny whether any person was interviewed or whether there were any witness statements taken in investigating and filing the complaint. These requests are nothing like the permissible requests framed in *Aetna*. They are instead a bald attempt to invade protected work product. The Trustee's request for a protective order with regard to these requests for admission and these interrogatories is well taken and is granted.

The court denies the Trustee's motion with respect to request for admission 5, however. That request does not seek protected work product.

With regard to Signature's requests for admission numbers 19 and 27 through 30, the court also holds that they too are protected work product and grants the Trustee's motion for protection. These requests for admission are again broadly worded and appear to be Signature's attempt to gain a list of the Trustee's interviewees during the course of the pre-litigation investigation, which for the reasons articulated above, are not discoverable. *See In re Aetna*, 1999 U.S. Dist. LEXIS 8038, at \*1-2; *In re Harmonic Sec. Litig.*, 245 F.R.D. at 428. Therefore, the court grants the Trustee's motion for a protective order in full.

**3. Conclusion**

In conclusion, for the reasons stated above, the court holds that *in camera* review of the Reports is appropriate in order to preserve any potential privilege from being lost. Based upon that review, the court holds that (i) the Reports are protected by the attorney-client privilege; and (ii) the Reports are protected opinion work product and ordinary work product. Accordingly, the Trustee's Motion for Protection and for In Camera Inspection of Haynes and

Boone Report and Alvarez Report is granted in full. Additionally, the Trustee's Motion for Protective Order is granted in part and denied in part as follows: the court denies the motion with respect to request for admission 5; and the court grants the motion with respect to requests for admission 1-4, 19, and 27-30 and interrogatories 2 and 17.

An order consistent with this opinion will be separately entered.